UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| DEBRA CARLTON, | } | Case No. 10-40388-JJR-13 |
| | } | |
| Debtor. | } | |
| _____ | | |
| FNB BANK (fka First National Bank of Scottsboro), | } } } | |
| | } | |
| Plaintiff, | } | |
| v. | } | Adv. P. No. 10-40054-JJR |
| | } | |
| DEBRA CARLTON, | } | |
| | } | |
| Defendant and Counter-claimant. | } } | |

## MEMORANDUM OPINION
(*NOT FOR PUBLICATION*)

On February 11, 2010 Debra Carlton ("Debtor") filed this chapter 13 case. Thirty days later the automatic stay terminated pursuant to § 362(c)(3)(A) of the Bankruptcy Code.[1] The stay terminated because within the previous 1-year period another chapter 13 case filed by the Debtor had been dismissed, and she did not seek an extension of the stay as allowed by § 362(c)(3)(B).[2]

At the time this case was commenced, the Debtor was behind on the installments due to her home mortgage lender, FNB Bank ("Bank"). The Bank had initiated the foreclosure process, but

---

[1] Unless otherwise indicated, references to the "Bankruptcy Code" or "Code" are to the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, and references to a "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure. Unless the context indicates otherwise, when used herein, the symbol "§" refers to a section, subsection or other subdivision of the Code.

[2] The parties submitted a Joint Stipulation of Facts and Exhibits, from which the Court was able to determine most of the material facts and pertinent documentary evidence.

had not completed the foreclosure sale when this case was filed on February 11, 2010. On April 5, 2010, although the stay had previously terminated, the Debtor was successful in obtaining confirmation of a plan that, if fully paid, would cure the mortgage default by paying the past-due installments over the term of the plan. The Bank did not object to confirmation of the plan.

On April 15, 2010, ten days after confirmation, the Bank began publishing a foreclosure notice with respect to the mortgage. The notice stated the Bank intended to hold a foreclosure sale on May 13, 2010. The day before the sale, Debtor's counsel sent a letter via facsimile to the Bank and its counsel asserting that an attempt to foreclose on the Debtor's home would constitute a violation of the confirmation order, and threatened to bring suit against the Bank and its counsel if the foreclosure was not stopped. The Bank responded to Debtor's counsel that the foreclosure had been cancelled. After the Bank cancelled the foreclosure, it commenced this adversary proceeding in which it asked the Court to declare that because the stay had not been extended, there was no prohibition against a post-confirmation foreclosure of the mortgage. In her answer to the Bank's complaint, the Debtor took the position that although the automatic stay was not extended, the Bank was nevertheless prohibited from foreclosing because it was bound by the terms of the Debtor's confirmed plan which provided for the cure of the mortgage default. After answering the Bank's complaint, the Debtor asserted a two-count counterclaim.

In the first count of the counterclaim, the Debtor asked the Court to hold the Bank in contempt, claiming the post-confirmation publication of foreclosure notices was a violation of the Court's order confirming the plan, and that she was entitled to an award of compensatory and punitive damages, and attorney's fees. The second count was based on the alleged failure of the Bank to respond to a request made by the Debtor pursuant to section 1641(f)(2) of the Truth-in-

2

Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), and demanded statutory damages and attorney's fees under TILA § 1640(a)(2)(A) and (a)(3).

The parties both agreed that the claims asserted in the Bank's complaint and the first count of the Debtor's counterclaim were core proceedings within 28 U.S.C. § 157(b)(2); however, in its answer, the Bank denied that the claims asserted in the second count of the counterclaim — the TILA claims — were core proceedings, and did not consent to the Bankruptcy Court's entry of a final order with respect to those claims.[3] The Bank did not further challenge the Court's jurisdiction to hear the TILA claims, and did not again raise that issue during trial or in its post-trial brief. The Court assumes the Bank has now consented to the Court entering a final order with respect to the TILA claims. Nonetheless, the Court finds those claims are in fact core proceedings under 28 U.S.C. § 157(b)(2). The determination of the TILA claims involves the allowance of the Bank's claims — or more accurately, the reconsideration of their allowance pursuant to § 502(j).[4] If the Debtor is entitled to recover on her TILA claims, then the Bank's allowed claims will be subject to set-off via reconsideration under § 502(j). Allowance, and likewise reconsideration of allowance, are core proceedings under 28 U.S.C. § 157(b)(2)(B).[5]

---

[3]The Court agrees with the parties that the claims made in the Bank's complaint and those asserted by the Debtor in the first court of her counterclaim are core proceedings under 28 U.S.C. § 157(b)(2); hence the Court may enter final orders and judgments on those claims.

[4]As discussed *infra*, the Debtor initially objected to the Bank's claims, but those objections were withdrawn.

[5]The Court is confident of its conclusion that adjudication of the TILA claims are within its core jurisdiction under 28 U.S.C. § 157(b)(2). However, the Bank did not challenge this Bankruptcy Court's jurisdiction based on an argument that a non-Article III judge does not have subject matter jurisdiction to hear the TILA claims asserted in the counterclaim. Nonetheless, because an adjudication of the TILA claims would be the basis for a reconsideration of the allowance of the Bank's claims via setoff, it appears this non-article III judge does in fact have the necessary subject matter jurisdiction to enter a final order on the TILA claims. *See Stern v.*

3

The Bank relies on this Court's ruling in *Cline v. Deutsche Bank National Trust Co. (In re Cline)*, 386 B.R. 344 (Bankr. N.D. Ala. 2008) to support its argument that, notwithstanding confirmation of the Debtor's plan, the Bank may proceed with the foreclosure of the mortgage encumbering the Debtor's home.[6] While the Bank's reliance on *Cline* was predictable, even a cursory reading of that decision demonstrates the Bank's reliance is misplaced. In *Cline,* the debtors were 40 months in arrears on their mortgage payments, and one of the debtors had filed seven bankruptcy cases in an effort to thwart a foreclosure by the mortgage lender. The debtors filed a motion to extend the automatic stay pursuant to § 362(c)(3)(B) which was actively opposed by the lender. Following the hearing on the debtors' motion, this Court entered an order authorizing the lender to foreclose after a specific date. In *Cline* this Court ruled that a pre-confirmation order denying an extension of the stay under § 362(c)(3) that expressly authorized a creditor to foreclose its mortgage, would trump an ostensibly contradictory provision in a later confirmed plan. However, what is important in the instant case is the exception carved out in *Cline* — an exception that applies to the Bank:

> However, if stay relief is not in effect with respect to a particular creditor when a plan is confirmed, but that creditor elects to accept and retain payments tendered under a confirmed plan, then the creditor should be estopped from denying the binding and superceding effects of confirmation

*Id.* at 354.

---

*Marshall,* 131 S.Ct. 2594 (2011).

[6]Apparently *Cline* represents the minority rule that confirmation of a plan proposing to cure a mortgage default does not override a pre-confirmation order denying extension of the stay under § 362(c)(3). *See, e.g., In re Hileman*, 451 B.R. 522 (Bankr. C.D. Cal. 2011) (citing cases and discussing minority and majority view). Whether *Cline* should be so broadly read is questionable, and this Court stands by its ruling in *Cline* under the facts therein.

4

The Bank did not oppose an extension of the stay; it could not have done so because the Debtor never sought an such an extension. The Debtor merely allowed the stay to terminate by default. Thus, unlike *Cline*, no order *specifically* authorizing the Bank to foreclose its mortgage was entered before confirmation. Most significantly, following confirmation, the Bank retained payments received from the chapter 13 trustee — payments remitted, in part, under the confirmed plan to cure the default in the mortgage. The first such payment was received by the Bank no later than May 4, 2010. Moreover, on May 12, 2010 the Bank filed two proofs of claim — one for the arrears and another for the unpaid principal balance of the mortgage.[7] The Bank took inconsistent positions: On one hand it retained plan payments and filed claims, yet on the other it proceeded with foreclosure. Nonetheless, there were circumstances that, when taken into account, cast the Bank's conduct in a less egregious light.

Notice of plan confirmation was mailed to the Bank on April 7, 2010.[8] The Bank's counsel sent the foreclosure notice to the newspaper for publication on April 8, 2010. It is reasonable to conclude the Bank did not receive notification of confirmation until after the foreclosure notice had been sent to the newspaper. The first notice was not published until April 15th, followed by the second on April 22nd and the third on April 29th. Regardless of the exact date the Bank received notice of plan confirmation, there was ample time for it to have instructed the newspaper to cancel at least the last two publications. Finally, it cannot be overlooked that the foreclosure sale never took place, and upon receiving the demand from Debtor's counsel, the Bank promptly replied that

---

[7]In *Cline*, the mortgage lender did not file a proof of claim; however, pursuant to § 501(c) and Bankruptcy Rule 3004, debtors' counsel filed a claim on behalf of the mortgage lender. 386 B.R. at 347.

[8]BNC Certificate of Notice attached to Doc. 53 filed April 7, 2010 in the Debtor's case.

5

the foreclosure had been stopped. One could reasonably conclude that the Bank did not intend to go through with the foreclosure sale after learning the Debtor's plan had been confirmed, but never bothered to notify the newspaper to cancel the publications. In any event, although there were mitigating circumstances, they do not add-up to an exoneration.

The Debtor's plan proposed to cure the default in her mortgage — a provision expressly permitted by § 1322(a)(5). Pursuant to § 1327(a), confirmation of the plan was binding on the Bank, and the remedies expressed in the mortgage that would have otherwise authorized the Bank to foreclose after default were usurped by the confirmed plan, which provided for a cure of the default. The Bank's continued publication of foreclosure notices after it received notice of plan confirmation was a violation of the Court's confirmation order — the order that gave efficacy to the Debtor's plan.[9]

As mentioned above, this Court's ruling in *Cline* provided little cover for the Bank's post-confirmation conduct, and the facts underlying the *Cline* decision do not mesh well with those now under consideration. The stay in the Debtor's case terminated as a result of the Debtor's inaction, hence there was no pre-confirmation order that specifically authorized foreclosure as there was in *Cline*. Moreover, and most significantly, the Bank's conduct — accepting plan payments and filing claims — estopped it from taking the position that the pre-confirmation termination of the stay allowed it to proceed with foreclosure. The Bank's post-confirmation conduct was exactly what this Court described in *Cline* as prohibiting a creditor from taking advantage of a pre-confirmation termination of the stay. This Court in *Cline* held that a creditor could not retain payments and ignore

---

[9]The Confirmation Order (Doc. 52) expressly provided for the trustee to pay to the Bank, from funds received under the plan, both the mortgage arrears and the on-going maintenance payments.

6

the confirmed plan — as the old English proverb goes, "You can't have your cake and eat it, too," or translated into chapter 13 jargon, "You can't take plan payments and foreclose the mortgage."

A creditor's wilful violation of a court's order cannot be ignored. *See, e.g.*, *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1208 (11th Cir. 1985) (discussing the fundamental premise that orders of court must be obeyed, and that disobedience of court orders merits punishment ). A violation is deemed wilful if the creditor knew of the order and intended the offending action. *Hardy v. United States (In re Hardy)*, 97 F.3d 1384, 1390 (11th Cir. 1996). A wilful violation of a chapter 13 confirmation order may be contemptuous, as it was in this case, and § 105(a) provides statutory authority for a bankruptcy court to award monetary sanctions to compensate a debtor for the resulting harm, and at the court's discretion, to further award attorney's fees incurred in successfully achieving enforcement of the offended order. *In re Rodriguez*, 367 F. App'x 25 (11th Cir. 2010).

In this case, the Bank knew of the confirmation order, which gave efficacy to the plan's provision providing for payment of the mortgage arrears and cure of the default. The post-confirmation publication of the foreclosure notices was intentional and constituted a violation of that order. Pursuing foreclosure was in direct contravention of the confirmed plan, and violated the default-curing provision of the plan as approved by the confirmation order. Thus, the Bank was guilty of contempt for its wilful violation, and the Debtor is entitled to be compensated for the harm she suffered as a consequence of the Bank's wilful failure to abide by the confirmation order.

The foreclosure was stopped and no foreclosure sale occurred — a significant mitigating factor. Nonetheless, the Debtor claimed she suffered emotional distress because the Bank continued the foreclosure process after her plan was confirmed. The threat of having one's home foreclosed

7

Case 10-40388-JJR13    Doc 81    Filed 08/26/11    Entered 08/26/11 10:17:54    Desc Main
Document      Page 7 of 15

would reasonably cause a homeowner to experience emotional distress and harm, especially if she believed the threat had been interrupted by successfully having her chapter 13 plan confirmed which provided for the cure of her mortgage default as permitted by § 1325(b)(5). However, it is impossible in this case to determine a monetary sum that will compensate the Debtor for the emotional harm she suffered as the result of the Bank's offending conduct. Sanctions for civil contempt may neither be a penalty nor speculative, and must be compensatory.[10]

At the time the post-confirmation foreclosure notices were published, many events had occurred, or were on-going in the Debtor's life that would naturally cause anyone emotional distress: (1) the Debtor had lost her job; (2) the duration of her unemployment compensation was uncertain; (3) she had started back to school to learn a new profession; (4) her son had been injured in an automobile accident; (5) her first bankruptcy case had been dismissed; (6) she filed a second bankruptcy case; (7) in her second case she lost the protection of the automatic stay; (8) after the stay terminated in her second case, and before her plan was confirmed, the Bank legitimately commenced foreclosure proceedings by publishing foreclosure notices;[11] (9) it was evident that if her plan had not been confirmed in this case, the Debtor would have lost her home through foreclosure; and (10) the Debtor was under a physician's care and taking medication for emotional

---

[10]Damages for civil contempt may also be coercive for the purpose of forcing compliance with the court's order. *Jove Eng'g, Inc. v. Internal Revenue Service (In re Jove Eng'g, Inc).*, 92 F.3d 1539, 1546 n. 4 (11th Cir. 1996) (civil contempt sanctions may be employed to coerce the defendant into compliance with the court's order, or to compensate the plaintiff for sustained losses, or both). In this case, the Bank immediately stopped the foreclosure proceedings after receiving the Debtor's demand. Thus coercion is no longer necessary, leaving only compensatory damages for consideration.

[11]*Reswick v. Reswick (In re Reswick)*, 446 B.R. 362 (BAP 9th Cir. 2011)(after stay terminated under § 362(c)(3)(A), postpetition garnishment did not violate stay).

8

issues before the contemptuous conduct occurred, but she did not seek further medical care after learning of the post-confirmation foreclosure notices. There was no evidence that would allow the Court to apportion the emotional harm caused by these other stressful events and the Bank's offending conduct.[12] Thus, while it is plausible that the Debtor suffered emotional harm as a consequence of the Bank's conduct, without resorting to speculation, there was no credible evidence upon which the Court could rely to determine an amount that would compensate the Debtor for the harm done.

In contempt proceedings arising from a violation of a chapter 13 confirmation order, the Court also has the authority under § 105(a) to award attorney's fees. *Rodriguez*, 367 F. App'x at 30 ("[W]e agree with the district court that the [creditor] violated the terms of Rodriguez's confirmed plan and, therefore, that the bankruptcy court's finding of contempt and award of attorney's fees was appropriate."). An award of attorney's fees in this case should be considered compensatory damages — it compensates the Debtor for fees incurred in her quest to enforce the confirmation order. However, such fees are limited to those incurred with respect to enforcement of the confirmation order — halting the post-confirmation foreclosure procedure pursued by the Bank — but such an award may not include fees incurred in defending the Bank's complaint for declaratory relief or prosecuting the Debtor's counterclaim for contempt. *Sternberg v. Johnston*, 595 F.3d 937 (9th Cir. 2009), *cert. denied*, 131 S.Ct. 102, 180 (2010). Once the Bank stopped the foreclosure process, the contempt also stopped. The confirmation order did not prohibit the Bank

---

[12]The Debtor testified that an award of $700,000.00 would compensate for the harm she suffered because of the publication of the post-confirmation foreclosure notices. There was nothing further offered to support the Debtor's testimony or for any other sum. If the Court were to award damages for emotional distress, it would have to resort to speculation.

9

from seeking declaratory relief, and it did not require the Bank to compensate the Debtor for attorney's fees she incurred in her attempt to collect damages cause by the contemptuous actions of the Bank.[13]

In *Sternberg*, the circuit court held that attorney's fees awarded for an automatic stay violation should be limited to those incurred with respect to enforcement of the stay, not those incurred while prosecuting the adversary proceeding for damages.[14] *Id*. at 947. *See also*, *Employment Dev. Dep't v. Bertuccio*, 2011 WL 1158022 (N.D. Calif. 2011) (refusal to issue license violated stay, but attorney's fees limited to those incurred until license issued); *In re Miller*, 447 B.R. at 435 (stay violation had ceased, thus no fees recoverable for unnecessary litigation). Although the contempt in this case arose from a violation of the confirmation order, not the automatic stay, the rationale with regard to an award of legal fees applies with equal force in the context of both situations, and there is no logical distinction between the two regarding what attorney's fees may be recovered.[15]

Defendant's (Debtor's) Exhibit 14 is an Affidavit of Attorney Fees claimed by Debtor's counsel. This affidavit itemizes services rendered from March 2, 2010 through March 7, 2011, with

---

[13]*In re Miller*, 447 B.R. 425 (Bankr. E.D. Pa. 2011)(once creditor ceased sending invoices, litigation to stop further stay violations was needless).

[14]"Permitting a debtor to collect attorney fees incurred in prosecuting a damages action would further neither the financial nor the non-financial goals of the automatic stay. . . . The stay is a shield, not a sword." *Sternberg*, 595 F.3d at 948. Following confirmation, the confirmation order promotes many of the same goals and provides similar protection from creditors as those conferred pre-confirmation by the automatic stay.

[15]The so called "American rule" with regard to awarding attorney's fees is applicable here. "The general policy [is] that all litigants, even the prevailing one, must bear their own attorney's fees." *Black's Law Dictionary* 92 (8th ed. 2004). There are statutory and contractual exceptions to the rule, but none apply in this adversary proceeding.

fees for the trial and trial brief being estimated or to be later determined. The affidavit also itemizes expenses, which were all for postage. After a careful review of the affidavit, the Court finds that the fees incurred from April 12, 2010 through May 13, 2010, with the exception of the April 20, 2010 entry for receipt of the "QWR" letter, were attributed to services rendered to enforce the confirmation order. Fees charged for those services total $390.00. The certified mail postage incurred on April 14, 2010 for $11.08 was attributed to the same services. Thus, attorney's fees and expenses that should be awarded to the Debtor for her counsel's fees and expenses for enforcement of the confirmation order total $401.08.[16]

Count Two of the Debtor's counterclaim seeks damages for violation of the provisions of the Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1641(f)(2), which provides in relevant part, "Upon written request by the ogligor, the servicer shall provide the obligor, to the best knowledge of the servicer, with the name, address, and telephone number of the owner of the obligation or the master servicer of the obligation." Failure to comply may trigger damages pursuant to 15 U.S.C. § 1640(a). Neither the TILA statute nor the regulations thereunder provide a specific time within which a request under § 1641(f)(2) must be answered; therefore, the answer must be made within a

---

[16]Although based on an alleged automatic stay violation, Judge Cohen's extensive opinion in *Hutchings v. Ocwen Federal Bank (In re Hutchings)*, 348 B.R. 847 (Bankr. N.D. Ala. 2006), held that a debtor was not entitled to recover her expenses, including attorney's fees, incurred in a proceeding to recover damages suffered because of a creditor's wrongful actions, where those actions were not continuing and did not require an undoing to make the Debtor whole. In the instant case, the Bank cancelled the foreclosure immediately upon receiving the demand from Debtor's counsel. Also, the Court is unaware of any authority, and Debtor's counsel has cited none, authorizing an award of attorney's fees for defending a declaratory judgment action that was not frivolous or filed in bad faith. Defending the Bank's action for a declaratory judgment was tantamount to defending a motion for relief from the automatic stay — essentially, they both sought the same relief that, if granted, would allow the Bank's foreclosure to proceed.

11

reasonable time. *Ording v. BAC Home Loans*, 2011 WL 99016 (D. Mass. 2011) (citing 12 C.F.R. 226.36(c)(1)(iii)). The Debtor had the burden of proof to establish the Bank's failure to comply by a preponderance of the evidence.

At trial, the Bank's representative, Mr. Kilgore, testified that he hand-wrote the response to the Debtor's TILA inquiry on the bottom of the original letter that he received from Debtor's counsel wherein the request was made. A copy of the letter with the hand-written response was admitted at trial. Mr. Kilgore further testified that he then made a notation in his file that he received the request for disclosure of the owner of the mortgage obligation and had returned the information to the Debtor's counsel. Finally, Mr. Kilgore testified that he placed the letter, with the hand-written information at the bottom, in a bank envelope addressed to Debtor's counsel and placed it in the outgoing mail, where it would then have been picked up by the person responsible for handing the outgoing mail and processed with the automatic stamp machine. The letter was not returned. This was the customary office procedure for sending mail.

Similarly, Debtor's counsel proferred (with Bank counsel's acquiescence) the testimony of two employees in his office, both of whom handled the incoming mail, that they followed the customary office procedure for receiving mail, but that neither recalled receiving the letter with the hand-written information returned from the Bank. Debtor's counsel did receive the Bank's response to a separate request for information under the Real Estate Settlement Procedures Act (para. 43 of Count II of the Counterclaim).

"'The common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee.'" *In re Rayborn*, 307 B.R. 710, 722 (Bankr. S.D. Ala. 2002) (quoting *Konst v. Florida East Coast Ry. Co.*, 71 F.3d 850, 851, 854 (11th Cir. 1996)). A denial of

12

receipt does not rebut the presumption, but rather creates a question of fact; the presumption can be overcome only by clear and convincing evidence that the document was not, in fact, mailed. *Id.* In the event the presumption is rebutted, the Court must weigh the evidence in making its determination. *Id.*

The Court finds the Debtor did not present sufficient evidence to overcome the presumption of mailing, and therefore fails to meet her burden of proof under the facts established at trial. Mr. Kilgore's testimony was detailed and credible, and the proffer, while equally credible, was insufficient to overcome the presumption of receipt, even under a preponderance of the evidence standard. The relief requested in Count Two of the Counterclaim is therefore due to be denied.

The Court has some concern that the TILA claim in this matter appears to have been put into play not because the Debtor had a legitimate question about the identity of the owner of her mortgage obligation, but rather in hopes that the Bank would fail to respond and would therefore open the door to statutory damages and attorney fees. In her schedules and plan, the Debtor listed "First National Bank of Scottsboro" as the creditor to whom the mortgage obligation was owed. The parties stipulated that the Chapter 13 Trustee had made payments to the Bank, and that the payments were not returned (see the discussion *supra* regarding the violation of confirmation order). The foreclosure notices recited that "FNB Bank, successor to the First National Bank of Scottsboro, Alabama" was the foreclosing creditor. Further, the proofs of claim filed in the case under penalty of perjury provided the information requested and have not been objected to on any grounds related to standing or right to receive payments. A review of the Court's docket for this case reveals no indication that the identity of either the owner or servicer of the mortgage obligation was questioned or in dispute.

13

The request at issue was certainly authorized under the TILA statute, but the Court is uncomfortable with TILA being used as an attempt to gain leverage rather than an attempt to gain information. The purposes behind TILA are "to provide protection to consumers by affording them meaningful disclosure . . . . It was not designed, nor should it be used to thwart, the valid claims of creditors." *Smith v. American Financial Systems, Inc. (In re Smith)*, 737 F.2d 1549, 1553 n. 9 (11th Cir. 1984) (quoting *Basham v. Finance Am. Corp.*, 583 F.2d 918, 928 (7th Cir. 1978), *cert. denied* 439 U.S. 1128 (1979) and *cert. denied* 444 U.S. 825 (1979)). Although strict compliance with the provisions of TILA is required, "it makes no sense to convert TILA from a shield protecting consumers into a sword allowing them to strike lenders who have followed the statute and its regulations as closely as logic permits." *Hefferman v. Bitton*, 882 F.2d 379, 382 (9th Cir. 1989). This strategy is particularly problematic where, as in this case, attorneys for both sides are involved and communicating regularly regarding the foreclosure, the filing of the bankruptcy, and the confirmation order issues. However, the information request upon which the claimed TILA violation hinged was apparently never put to rest by a simple request to the Bank's counsel that the missing information be supplied prior to the "gotcha" moment at the filing of the counterclaim. Even after the filing of the counterclaim, the attorneys for both parties communicated regarding discovery, the parties' planning meeting and report to the court, and trial preparation. At no point in time does it appear the Debtor ever had any legitimate question as to the identity of the owner and servicer of her mortgage. The goal of TILA is to provide the consumer with information, and that goal appears to have already been met in this case by the information in Debtor's own petition, schedules, and plan, the accuracy of which was not in question at the time the TILA request was sent, nor at any

14

other time.[17]

Accordingly, pursuant to Bankruptcy Rule 9021, a separate Order will be entered in conformity with this Opinion.

Dated: August 26, 2011

/s/ James J. Robinson
JAMES J. ROBINSON
United States Bankruptcy Judge

---

[17] I echo the concern expressed by Justice Trott of the Court of Appeals for the Ninth Circuit in his dissent in *Jackson v. Grant*, 890 F.2d 118, 122-23 (9th Cir. 1989), wherein he points out that TILA was designed by Congress to shield unwary consumers but is sometimes used as a sword to gain an unintended advantage– a circumstance he describes as " a well-intentioned law being used for questionable purposes."

15